IN THE UNITED STATES COURT
DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| CAROL DEVANE, AS WIDOW AND PERSONAL REPRESENTATIVE FOR THE ESTATE OF JETHRO DEVANE, | ) ) ) | CIVIL ACTION NO.: 0:22-CV-1735-MGL-PJG |
| Plaintiff, | ) ) ) | COMPLAINT (Jury Trial Requested) |
| vs. | ) ) ) | |
| CITY OF ROCK HILL, VINCENT MENTESANA, in his individual capacity, JESSICA MAGGIO, in her individual capacity, STEVEN PEARCY, in his individual capacity, and MICHAEL ENGLERT, in his individual capacity, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

The Plaintiff named herein, complaining of the Defendants, would respectfully show unto this Honorable Court and allege as follows:

**Parties**

1.    This is an action for money damages brought against Defendants pursuant to 42 U.S.C.A. §§ 1983, 1985, and 1988 for violations of Plaintiff's federally protected civil rights under the United States Constitution.

2.    The Plaintiff, Carol DeVane as Widow and Personal Representative for the Estate of Jethro DeVane ("Plaintiff"), is a citizen and resident of the County of Rock Hill, State of South Carolina. Mrs. DeVane is the longtime wife and now widow of Mr. DeVane, the senior citizen subjected to the acts and omissions of Defendants that give rise to this action.

3.    Jethro DeVane, born June 21, 1948, died in his sleep on May 21, 2022, at the age of 73.

4.    Jethro DeVane has been seeking justice, compensation for his damages, including but not limited to those caused by the horrendous violation of his Civil Rights and Liberties as described more fully herein, and something as small as an official public apology from Defendant City of Rock Hill over this subject incident since it first occurred on June 3, 2019.

5.    Mr. DeVane unfortunately died without any of the aforementioned happening, and his wife, Carol DeVane, now steps into his shoes as widow and Personal Representative of his Estate to pursue the same on his behalf. Mrs. DeVane, as surviving spouse, is the sole heir of Mr. DeVane, and the couple had no children.

6.    The Defendant City of Rock Hill (hereinafter "City") is a governmental agency/entity existing under the laws of the State of South Carolina. At all times hereinafter mentioned in this lawsuit, the Defendant City acted and carried on its business by and through its agents, servants, and/or employees.  Additionally, these agents, servants, and/or employees (to include and not be limited to the law enforcement personnel mentioned below) were operating within the scope of their officially assigned and/or compensated duties.

7.    Defendant, Vincent Mentesana (hereinafter "Mentesana") is a citizen and resident of the County of York, State of South Carolina and was at all times referenced herein acting within the course and scope of his employment with and/or authorization of the City. Further, at all times referenced herein, Defendant Mentesana was operating under the color of state law as an officer working for the City.

8.    Defendant, Jessica Maggio (hereinafter "Maggio") is a citizen and resident of the County of York, State of South Carolina and was at all times referenced herein acting within the course and scope of her employment with and/or authorization of the City. Further, at all times referenced herein, Defendant Maggio was operating under the color of state law as an officer

working for the City.

9.      Defendant, Steven Pearcy (hereinafter "Pearcy") is a citizen and resident of the County of York, State of South Carolina and was at all times referenced herein acting within the course and scope of his employment with and/or authorization of the City. Further, at all times referenced herein, Defendant Pearcy was operating under the color of state law as an officer working for the City.

10.     Defendant, Michael Englert (hereinafter "Englert") is a citizen and resident of the County of York, State of South Carolina and was at all times referenced herein acting within the course and scope of his employment with and/or authorization of the City. Further, at all times referenced herein, Defendant Englert was operating under the color of state law as an officer working for the City.

11.     Defendants Mentesana, Maggio, Pearcy and Englert (collectively, hereinafter "Defendant Officers") were at all times relevant herein working in conjunction with each other in furtherance of the City's business, and each caused and or contributed to the complained upon incidents. For purposes of claims asserted under 42 U.S.C. §§ 1983, 1985, and 1988, Defendant Officers are being sued in their individual capacity for acts taken under the color of state law.

During the incidents complained of and time periods consistent therewith, Plaintiff's Constitutional rights were well established and well known to each of the Defendants listed above, including but not limited to, Plaintiff's right to due process, right to be free from danger, right to be free from unlawful use of force, and his right to be free from unreasonable search and seizure of his person and home. Additionally, these Defendants had actual and/or constructive knowledge that they or their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of Constitutional injury to Plaintiff. Further, the response of these Defendants to that

knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the offenses by them as alleged herein; and there was a causal link between their actions and/or inactions and the Constitutional injury suffered by Plaintiff

12.     This Court has jurisdiction over this matter because the most substantial acts and omissions giving rise to liability occurred within York County, South Carolina.

<u>**Factual Allegations**</u>

13.     Plaintiff incorporates by reference any and all allegations set forth in the Paragraphs above as if set forth verbatim herein.

14.     At all times referenced herein, Officers involved in the June 3, 2019 interaction with Plaintiff were operating within the course and scope of their duties so as to make City liable for their acts and omissions under the doctrine of *Respondeat Superior*.

15.     This action arises out of the unlawful detention, arrest, and civil assault and battery of Plaintiff as well as the unlawful search of Plaintiff's residence and unconstitutional seizure of Plaintiff's person in the City of Rock Hill on or about June 3, 2019. Defendant's actions, through the acts and omissions of Officers, left Plaintiff with short term and permanent injury which will last for the remainder of his natural life, the legally presumptive length of which is codified under S.C. Code of Laws § 19-1-150.

16.     On or about June 3, 2019, City received a call for service at 731 Douglas Street, Rock Hill, S.C. 29730 regarding a citizen whom allegedly witnessed four (4) juveniles inside the citizen's vehicle, which was parked in front of the citizen's residence. The citizen did not live near Plaintiff.

17.     City Officers responded to the residence and spoke with the citizen. The juveniles were no longer on scene, and the citizen reported that there were four (4) male juveniles – juveniles

meaning children or teenagers – wearing hoodies. The citizen confirmed that nothing was stolen from the vehicle and that nothing was inside of the vehicle because the citizen had just bought the 2003 white Honda Accord. The citizen did not report any bodily injury, threat of bodily injury, violence, robbery, possession of weapons, or other violent crime to the Officers.

18.    According to Officer Trevor Arrowood and per official City reports:

While speaking with ███ and McCoy, Officer Arrowood observed the 4 males running on Lucky Lane and informed Officers that were circulating the area. Officers searched the field where the suspects were last seen but did not see anyone. Officers observed an open door of a residence in the area and searched it. While conducting the search Officers located an older male in the residence, but did not located the juveniles.

*See Exhibit A.*

19.    Officer Arrowood clearly confirmed that the Officers *"searched the field where the suspects were last seen but did not see anyone."* The Officers were not in hot pursuit or fresh pursuit of the juveniles at the time the Officers trespassed on Plaintiff's property.

20.    Officer Arrowood's written report with regards to the search of Plaintiff's residence and the Officers interaction with Plaintiff is inaccurate and not a true account of what occurred. Officers interaction with Plaintiff and search of his residence was recorded on body-worn camera and confirms Officer Arrowood's account in that regard to be untrue.

21.    Specifically, Officers were walking around Plaintiff's neighborhood with no regard to any citizens personal property rights and right to privacy and security in their own homes.

22.    Plaintiff, who was in his bedroom laying down to sleep saw light shining through his bedroom window. Plaintiff got up, went to his back door, opened it and peeked out to see who was in his yard.

23.    On opening the door, Plaintiff did not initially see anyone in the yard. Shortly thereafter, Plaintiff saw a flashlight in the distance moving towards his home in the backyard, behind which a fence was located.

24.     Officer Mentesana had jumped a fence and had begun running towards Plaintiff's home in response to Officer Maggio calling over the radio that Plaintiff's back door was open.

25.     As the flashlight in the distance approached the back door, Plaintiff stood at the door and slowly began closing because he could not see who the person was and the person had yet to say anything. Officer Mentesana began yelling:

> *Rock Hill police let me see your fucking hands, let me see your fucking hands. Get out. Get out. Don't fucking shut that door.*

26.      Plaintiff, and elderly man, had his hands up the entire time. He was also completely naked and afraid that Officer Mentesana, who was aggressively pointing his department issued firearm, was about to shoot him.

27.     Standing in his doorway, Plaintiff pled to the Officers: *"I live here, I live here."*

28.     Plaintiff was then aggressively order out of the home and into his yard completely naked. Officer Mentesana used physical force to remove Plaintiff from his residence. Officers then searched his home while Officer Mentesana held him at gun point forcing Plaintiff to keep his hands on the outside wall of the home.

29.     Plaintiff asked Officer Mentesana why they were in his yard and was told: *"Face the house right now, I don't want to talk to you."*

30.     The Officers proceeded to conduct a full search of Plaintiff's residence while Plaintiff remained held at gun point completely naked and fully exposed outside of his own home.

31.     After the Officers finished searching Plaintiff's residence, Officer Mentesana explained:

> *The reason we did that is because we got a group of four (4) juveniles – what we think – four (4) males running around trying to break into cars.*

32.     The Officers did not even know nor did they even ask for Plaintiff's name until

after he was forced out of his home at gun point completely naked while getting cursed at and held

completely naked outside of his home at gun point while Officers searched his home.

33.     The Officers did not see any juveniles in the area of Plaintiff home, did not see

anyone run inside of or enter Plaintiff's home, were not in fresh pursuit or hot pursuit at the time

they interacted with Plaintiff, and Plaintiff is obviously an elderly man far removed from his days

as a juvenile or teenager. Plaintiff was also buck naked and unarmed.

34.     To the extent the Officers, or any Officer thought Plaintiff's home was

"abandoned," that ended immediately when Officers saw Plaintiff in the home and Plaintiff

informed them that he lived there.

35.     Plaintiff did his best to remain calm, comply with the Officers' commands, and

offered information to the Officers even after he was treated so poorly in an attempt to ensure he

would make it through the interaction alive and so the Officers would truly know he was an

innocent citizen.

36.     Officer Mentesana stated, which was recorded on body-worn camera: *"I don't care

if it's private property – you think I care?"*

37.     Defendant and Officers did not have a search warrant nor did the Officers ask for

permission to search Plaintiff's home. Further, the Officers effectively kidnapped Plaintiff against

his will when he was forced out of his house at gunpoint under the duress that he would be shot

for failing to comply or closing his door, and then held him against his will at gunpoint outside of

his own home completely naked in public view.

38.     Defendant, by and through Officers, caused Plaintiff bodily injury and severe

mental anguish and trauma, including other actual and compensatory damages.

39.     Plaintiff filed a Citizen Complaint with Defendant over the subject incident.

7

Defendant's Chief of Police, Chris Watts, determined that Officer Mentesana was discourteous, but that the Officers did not conduct an improper search of Plaintiff's home. The Chief concluded: *"Procedurally, Officer Mentesana and Officer Maggio acted within established policies and standard operating procedures of the Rock Hill Police Department." **See Exhibit A***.

40.    Defendant City of Rock Hill's policies and procedures with regards to this underlying incident – namely uses of force and search and seizure – are unconstitutional in their application per the aforementioned admission by City's Chief of Police.

41.    Officers had no reason to take the actions they did as no one had seen the four (4) juveniles enter the premises, no one had chased the juveniles into Plaintiff's yard, no one had alleged there was a home break-in, and Plaintiff, a senior citizen, was present at the back door the home informing the Officers that he lived there.

42.    The Officers were not conducting a warrantless search incident to arrest as outlined in Chapter 1, Section 1.08 IIIA – Search & Seizure – of Rock Hill Police Department's Policy Manual:

A. Searches Incident to Arrest

Officers will conduct searches incident to arrest, subject to the following conditions:

1. The arrest is lawful and the search is reasonably related to the circumstances of the arrest.

2. For the purpose of seizing fruits, instrumentalities, contraband and/or other evidence of the crime for which the arrest was made and to prevent the destruction or concealment of evidence, or to remove weapons or dangerous instrumentalities that the arrested person might use to resist or effect an escape.

3. When the arrest is not an excuse to conduct the search.

4. The search is limited in scope to the person of the suspect and the immediate surrounding area. Immediate surrounding area means the area from which the suspect can either obtain a weapon or destroy evidence. In some cases the entire room in which the arrest took place is deemed a surrounding area. Once an arrestee has been removed from this area or room, (s)he could not get a weapon or destroy evidence; therefore, the search will terminate.

5. The search is substantially contemporaneous with the arrest and conducted in the immediate vicinity of the arrest. An exception to this procedure is that an arrested person may be more thoroughly searched at the holding area prior to lockup.

6. An officer conducting a search incident to arrest may use the degree of force reasonably necessary to perform his or her duty.

43.     The Officers were not conducting a warrantless search with Plaintiff's consent as outlined in Chapter 1, Section 1.08 IIIB – Search & Seizure – of Rock Hill Police Department's Policy Manual:

B. Consent Searches <1.2.4>

Officers may conduct a search of persons even though the officer does not have a warrant or probable cause if the officer has obtained the prior consent of the person who will be affected by the search or of someone who has the right and authority to act for the person who will be affected by the search. Keep in mind the following:

1. That consent will be positive.

2. That silence in and of itself does not solely indicate consent.

3. That the person asked for consent may not be coerced in any manner.

4. The person may withdraw consent at any time during the search and the search will stop.

5. Whenever practical, officers requesting consent will obtain a written waiver from the person in lawful possession of the premises or object to be searched. This written waiver is commonly known as a Consent to Search Form.

44.     The Officers were not conducting a warrantless search of a moveable vehicle as outlined in Chapter 1, Section 1.08 IIIC – Search & Seizure – of Rock Hill Police Department's Policy Manual:

C. Movable Vehicle Exception

An officer may make a warrantless search of a car, truck, RV, boat, airplane or other vehicle in the following situations:

1. When the vehicle is in motion or at least mobile when seized; and

2. There is probable cause to believe it contains contraband or evidence of a crime; and

3. Taking time to obtain a warrant will delay in the search, permitting the vehicle to be moved and possibly preventing the search.

45.    The Officers were not conducting a warrantless search of a motor home/mobile home as outlined in Chapter 1, Section 1.08 IIID – Search & Seizure – of Rock Hill Police Department's Policy Manual:

D. Motor Home/Mobile Home

Officers may conduct warrantless searches of mobile/motor homes if they fall under the movable vehicle exception requirement (that is, they are mobile and capable of being driven on the road). A mobile/motor home meets the vehicle exception requirements when the vehicle is moving or readily mobile by the turn of a switch key. The determinant is whether it is a vehicle rather than a home. Factors to consider are:

1. Location
2. Readily mobile
3. Elevated on blocks
4. Vehicle licensed
5. Vehicle connected to utilities ( i.e., electricity, sewer, water)
6. Convenient access to a public road

46.    The Officers were not conducting a warrantless search of a crime scene as outlined in Chapter 1, Section 1.08 IIIE – Search & Seizure – of Rock Hill Police Department's Policy Manual:

E. Crime Scenes

1. During the initial response to a call for service, there is no requirement for a search warrant where a crime has occurred and the crime scene has been secured for the purpose of processing the scene for evidence. However, when the crime scene search will be intensive and time consuming and when evidence may be obtained to be used against an owner /occupant of the crime scene, it is beneficial to obtain a search warrant early in the process.

2. Once police have completed processing a crime scene and relinquished control of it, the location is again subject to all constitutional protections against unreasonable searches and seizures. For more detail on crime scene searches, see General Order Chapter 83, Section #1.01 (Collection and Preservation of Evidence).

47.    The Officers were not conducting a warrantless search to save a life, prevent injury, or prevent serious property damage in what would be considered an "exigent circumstance" as outlined in Chapter 1, Section 1.08 IIIF – Search & Seizure – of Rock Hill Police Department's

Policy Manual:

F. Exigent Circumstances

Officers may make a warrantless search of a person, personal belonging, a vehicle, or a building when there is good reason to believe it necessary to:

1. Save a life
2. Prevent injury; or
3. Prevent serious property damage

48.    The Officers were not conducting a warrantless search of an impounded vehicle as outlined in Chapter 1, Section 1.08 IIIG – Search & Seizure – of Rock Hill Police Department's Policy Manual:

G. Impounded Vehicles

1. Officers will routinely conduct a warrantless inventory of any lawfully impounded vehicle to:

   a. Protect the owner's property;
   b. Protect the Department against claims of lost or stolen property;
   c. Make sure that no weapons or other dangerous instruments fall in the hands of vandals or thieves.

2. Officers will complete a Vehicle Inventory Sheet on every impounded vehicle. Please refer to General Order Chapter 61, Section #1.06 (Traffic Ancillary Services) for more information on Impounded Vehicle Searches.

49.    The Officers were not conducting a warrantless search in "hot pursuit" as outlined in Chapter 1, Section 1.08 IIIH – Search & Seizure – of Rock Hill Police Department's Policy Manual:

H. Hot Pursuit

1. If an officer is pursuing a person and has probable cause to believe that (s)he has just committed a crime, officers may search the structure or premises into which the officer has pursued the person if necessary to:

   a. Protect his or her safety;
   b. Protect the safety of the public; or
   c. Prevent an escape.

2. Hot pursuit searches occur prior to arrest. Authority is limited. Once the suspect has been apprehended, the search will immediately cease.

50.    Unlike the Chief of Police's determination with regards to the Defendant's policy, "Hot Pursuit" only applies and Officers can only search a structure or premises if "the officer has pursued the person" into the structure or onto the premises. That did not happen in the subject

11

instance.

51.     The Officers were not conducting a warrantless search of an abandoned property as outlined in Chapter 1, Section 1.08 III, I – Search & Seizure – of Rock Hill Police Department's Policy Manual:

I. Abandoned Property

Officers may, without a warrant, search and seize property that (s)he has good reason to believe has been abandoned.

52.     Plaintiff's property was not abandoned and in fact, there was a very expensive flatbed heavy duty truck in the driveway of Plaintiff's residence. Plaintiff was also at the back door when officers approached.

53.     The Officers were not conducting a warrantless search of open fields as outlined in Chapter 1, Section 1.08 III, J – Search & Seizure – of Rock Hill Police Department's Policy Manual:

J. Open Fields

An officer may enter and search any unoccupied or undeveloped area that lies outside the curtilage of a dwelling. Curtilage is the area around the home to which the home life activity extends. The curtilage protection only applies to the property owner.

54.     The Officers were not conducting a warrantless search of things in plain view as outlined in Chapter 1, Section 1.08 III, K – Search & Seizure – of Rock Hill Police Department's Policy Manual:

K. Plain View

There is no requirement that a warrant be obtained before seeing objects brought into public places open to plain view. However, officers will have a good reason to be at the place where the evidence is found. Officers may, without a warrant, seize any contraband or evidence of a crime that is in "plain view" of where the officer is:

1. Lawfully present; and
2. Had no expectation of finding the contraband or crime evidence; and
3. When it is not practical to get a warrant.

55.     The Officers were not conducting a warrantless stop and frisk search as outlined in Chapter 1, Section 1.08 III, L – Search & Seizure – of Rock Hill Police Department's Policy

Manual:

L. Stop and Frisk

"Stop and frisk" or Terry searches are covered under General Order Chapter 41, Section #1.03 (Field Interviews). </44.2.2 c.>

56.    The aforementioned policies of Defendant were written by, or at a minimum, approved and officially signed off on by Chief of Police Chris Watts on behalf of Defendant City of Rock Hill. Even if not unconstitutional on their face, the application of these policies by Defendant City of Rock Hill and its police department is done in an unconstitutional way as evidenced in the subject matter.

57.    Defendants originally maintained that the Officers were in "hot pursuit" and therefore their treatment of Plaintiff, including the search and seizure were proper. After that stance was debunked and determined to be inaccurate, Defendants then – more than one year later and after undergoing substantial public scrutiny – changed their explanation for the unlawful search and seizure, publicly stating:

> ...The officers observed the grass to be uncut, a swimming pool unmaintained, and the door of the residence standing completely open. There were no lights on inside the residence or outside the residence. Officers believed the resident to be unoccupied.
>
> Our officers focused on the residence due to the circumstances which lead them there. With a reasonable belief the subjects could have run inside the residence, the residence appearing to be abandoned, and in the interest of public safety to make sure no one else was inside being harmed, our officers decided to physically check the residence. While making approach, they encountered Mr. Devane who appeared in the doorway.

**See Exhibit B**.

58.    This explanation of the City and Officers' actions was constructed <u>after</u> the initial, failed attempt to justify the incident that forms the basis of this lawsuit. The new explanation is just as flawed as the original justification given by Defendants.

59.     This incident occurred in the wee-hours of the morning during a time when most citizens have their lights off because they are trying to sleep, just as Plaintiff was.

60.     The residence was obviously not unoccupied. Any "belief" of the same was corrected the moment Defendants met Plaintiff at the door and he informed them that he lived there.

61.     Defendant City of Rock Hill, through its agents, representatives, and employees made the aforementioned, official public statement on December 22, 2020, in furtherance of the civil conspiracy to violate Plaintiff's civil rights and avoid consequence for having done the same. The account of the incident as set forth in this December 22, 2020 official statement is not documented in Defendant Arrowood's Incident Report – the same being the only incident report generated by any of the Defendant Officers who participated in the subject incident.

62.     This is not an isolated incident. Defendant City and its officers police and interact with citizens differently depending on where the citizen lives. In more affluent, wealthy areas of the City of Rock Hill, Defendant City and its officers are more polite, courteous, and respectful not just of the citizens, but of the constitutional rights of citizens. In areas such as the area the subject incident occurred, Defendant City and its officers operate consistently as they did in the underlying incident, without regard to the constitutional rights of citizens to be free from unlawful use of force and unlawful search and seizure of their person and property, including the citizens own home.

63.     Defendant officers searched other properties after leaving Plaintiff, including other properties in the neighborhood owned by Plaintiff. Each of those properties were searched in violation of Plaintiff's civil rights as owner of the property as the properties were searched without a warrant or Plaintiff's consent.

14

64.    Defendant City failed to terminate or discipline officers who demonstrate patterns of misconduct.

65.    Defendant Mentesana was subject to prior citizen complaints, none of which resulted in discipline or reprimand. Defendant Mentesana was subject to complaints regarding unlawful detention and searching of residences prior to his interaction with Plaintiff.

66.    Defendant City has observed unlawful or otherwise improper conduct by Mentesana throughout his career but has tolerated it and refused to remedy or mitigate it.

67.    Defendant Mentesana was precisely the type of reckless and dangerous officer that Defendant City encouraged him to be.

68.    Defendant City has a history of racially biased based policing practices. Despite black community members accounting for approximately 38% of the population, they account for majority of the subjects of police use of force in the city. The neighborhood the subject incident occurred in is a predominately African American neighborhood in the city.

## FOR A FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983 Violation of Due Process – 14th Amendment)
### (As to Individual Officer Defendants)

69.    The foregoing factual allegations are made a part of this First Cause of Action through incorporation by reference.

70.    The above described actions subjected Plaintiff to a deprivation of rights and privileges secured to Plaintiff by the Constitutional and laws of the United States, including the right to due process under the 14th Amendment.

71.    Plaintiff's detention and search and seizure of his person and home was made under the color of law as Defendants acted pursuant to their duties as law enforcement officers for Defendant City, were in City uniforms, and carrying City owned equipment, among other things.

72.     As a direct and proximate result of the above-mentioned unconstitutional acts of Defendants, Plaintiff's civil rights were violated, and he has suffered physical injuries and damages, mental anguish, emotional distress, humiliation, deprivation of his freedom, litigation costs and attorney's fees.

73.     Plaintiff is entitled to compensatory damages, attorney's fees pursuant to 42 U.S.C. § 1988, and costs to be determined by the trier of fact and punitive damages in an amount sufficient to punish Defendants as well as deter similar conduct by Defendants and others.

<b>FOR A SECOND CAUSE OF ACTION</b>
<b>(42 U.S.C. § 1983 4th Amendment Violations)</b>
<b>(As to Individual Officer Defendants)</b>

74.     The foregoing factual allegations are made a part of this Second Cause of Action through incorporation by reference.

75.     The above described actions subjected Plaintiff to a deprivation of rights and privileges secured to Plaintiff by the Constitutional and laws of the United States, including the right to be free from unlawful search and seizure under the 4th and 14th Amendments as well as unlawful use of force against his person.

76.     As set forth above collectively herein, Plaintiff was subjected to numerous violations of his 4th Amendment rights throughout the course of Defendants' search, seizure, and forcible removing Plaintiff from and forcible holding of him outside his home.

77.     Plaintiff's detention, search and seizure of his person and home, and the force used against his person, including the pointing and holding of a loaded firearm on his person, was made under the color of law as Defendants acted pursuant to their duties as law enforcement officers for Defendant City, were in City uniforms, and carrying City owned equipment, among other things.

78.     As a direct and proximate result of the above-mentioned unconstitutional acts of

16

Defendants, Plaintiff's civil rights were violated, and he has suffered physical injuries and damages, mental anguish, emotional distress, humiliation, deprivation of his freedom, litigation costs and attorney's fees.

79.    Plaintiff is entitled to compensatory damages, attorney's fees pursuant to 42 U.S.C. § 1988, and costs to be determined by the trier of fact and punitive damages in an amount sufficient to punish Defendants as well as deter similar conduct by Defendants and others.

### FOR A THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983 – Monell and Canton)
### (As to Defendant City)

80.    The foregoing factual allegations are made a part of this Third Cause of Action through incorporation by reference.

81.    The Mayor, City Council, and the Police Chief had final policymaking authority with regard to establishing written policies and training programs governing the conduct of RPD officers performing policing functions on behalf of the City.

82.    The Mayor, City Council, and the Police Chief established and/or approved of RPD's written policies and training governing the conduct of RPD officers performing policing functions.

83.    The written policies and training established and/or approved by the Mayor, City Council, and the Police Chief constitute the official policy of the City and were the moving force behind and caused Plaintiff's injuries.

84.    The City, acting by and through its Mayor and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from RPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tactitly authorized the same. This deliberate indifference preceded the subject incident and continued

17

thereafter.

85.     The City had the power to terminate or appropriately discipline the subject officers for their conduct prior to the subject incident, but failed to do so despite the City's knowledge of a pattern of complaints and problems regarding its officers' interactions with the public.

86.     By refusing to terminate or properly discipline its officers, including the subject officers, the City caused the officers to act with impunity and without fear of retribution.

87.     City's failure to terminate or properly discipline the subject officers is part of its larger custom, policy, or practice of failing to supervise, terminate, or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct, and thereby encouraged the subject officers to continue engaging in unlawful acts towards citizens, including Plaintiff.

88.     Defendant City had a duty to adequately train, supervise and discipline its officers in order to protect members of the public, including Plaintiff, from being harmed by its officers unnecessarily.

89.     Defendant City failed to adequately train, supervise and discipline its officers over time, and were aware of wrongdoings by its officers, the same creating and reinforcing a custom or policy of failing to discipline, supervise, and adequately train officers.

90.     Defendant City also failed to properly and appropriately reprimand, discipline and/or counsel Defendant Officers after the complained of incident in furtherance of Defendant City's policies and procedures of allowing unconstitutional actions by their officers to go unchecked.

91.     Defendant Officers' acts and omissions constituted violations of Plaintiff's civil rights as enumerated herein, including the unconstitutional search and seizure of Plaintiff's person and home. Defendant City's Chief provided in official City documentation, attached hereto as

*Exhibit A*, that Defendant Officers' actions were in compliance with official City policies and procedures. Therefore, Defendant City's written policies and procedures, and their application, with regards to search, seizure and use of force are unconstitutional by Defendant City's Chief admission.

92.     Each action taken by Defendant City's agents were performed under the color of state law in association with their duly tasked, official duties.

93.     Defendant City was deliberately indifferent to its citizens, including Plaintiff's, constitutional rights and wellbeing and thereby proximately caused injury to Plaintiff as complained of herein.

94.     As a direct and proximate result of the acts and omissions of Defendant City as collectively set forth herein, Plaintiff's civil rights were violated, and he has suffered physical injuries and damages, mental anguish, emotional distress, humiliation, deprivation of his freedom, litigation costs and attorney's fees.

95.     Plaintiff is entitled to compensatory damages, attorney's fees pursuant to 42 U.S.C. § 1988, and costs to be determined by the trier of fact and punitive damages in an amount sufficient to punish Defendants as well as deter similar conduct by Defendants and others.

**FOR A FOURTH CAUSE OF ACTION**
**(42 U.S.C. § 1983 5th Amendment Violations)**
**(As to Individual Officer Defendants)**

96.     The foregoing factual allegations are made a part of this Sixth Cause of Action through incorporation by reference.

97.     The above described actions subjected Plaintiff to a deprivation of rights and privileges secured to Plaintiff by the Constitutional and laws of the United States, including the right to not be deprived of life, liberty, or property without due process of law under the 5th and

14th Amendments.

98.    The 5th Amendment provides a constitutional protection and right of a citizen, to wit Plaintiff, to be free from the deprivation of his life, liberty or property without due process of the law. It further mandates at the general level that government, to wit Defendants, must act in accordance with legal rules and not contrary to them.

99.    Defendants' acts and omissions as described fully herein amount to an utter and complete deprivation of Plaintiff's right to due process of the law under the 5th Amendment, including the fact that Plaintiff's person and property were searched and seized without Defendants utilizing the legal process to obtain a duly executed search warrant based upon presentation of evidence sufficient to amount to probable cause as determined by the court.

100.    All of the aforementioned actions by Defendants were made under the color of law as Defendants acted pursuant to their duties as law enforcement officers for Defendant City.

101.    As a direct and proximate result of the above-mentioned unconstitutional acts of Defendants, Plaintiff's civil rights were violated, and he has suffered physical injuries and damages, mental anguish, emotional distress, humiliation, deprivation of his freedom, litigation costs and attorney's fees.

102.    Plaintiff is entitled to compensatory damages, attorney's fees pursuant to 42 U.S.C. § 1988, and costs to be determined by the trier of fact and punitive damages in an amount sufficient to punish Defendants as well as deter similar conduct by Defendants and others.

### FOR A FIFTH CAUSE OF ACTION
**(42 U.S.C. § 1983 – Civil Conspiracy)**
**(As to All Defendants)**

103.    The foregoing factual allegations are made a part of this Fourth Cause of Action through incorporation by reference.

20

104.    That the above-named Defendants did conspire together through overt acts in furtherance of the conspiracy – including through false, misleading, and inaccurate statements, official City reports and the lack of creating the same as is normal protocol for incidents in which officers pull weapons on citizens or conduct searches and seizures, other actions and inactions mentioned in the Complaint – to deprive Plaintiff, directly and/or indirectly, of equal protection and due process of the law under the 14th Amendment.

105.    Said deprivation of Plaintiff's rights were for the benefit of Defendant City, its agents, employees and representatives, and Defendants' acts and omissions effectively impeded, hindered, obstructed, and defeated the due course of justice in South Carolina, York County. Defendants took such action with the intent to deny Plaintiff the equal protection of the law and/or to injure him personally because of his racial status as a minority, his perceived economic status based on the neighborhood in which the incident occurred, and the racial makeup of the neighborhood.

106.    Defendants further attempted to violated Plaintiff's civil rights in violation of 42 U.S.C. § 1985 by justifying and exonerating Defendant Officers for their actions in an attempt to discourage Plaintiff from pursue civil action against Defendants.

107.    Plaintiff was in fact deprived of equal protection and due process under the law by and through the acts of Defendants as mentioned collectively in the Complaint and as a direct result thereof, suffered additional physical, mental, and emotional harm.

108.    Defendant City's employees withheld information regarding the nature of the interaction with Plaintiff, multiple employees worked together to conspire against Plaintiff, and multiple employees planned and implemented false and substantially misleading allegations regarding the incident.

21

109.     More than one person participated in the conspiracy and took overt acts towards that end, in part as indicated below:

    a.   The Chief of Police, per Exhibit A, exonerated the Officers for an unlawful search and seizure despite written policies and procedures clearly indicating the policies as written were violated;

    b.   Defendant City, through Lt. Michael Chavis, created false and misleading allegations and made misleading public statements regarding the nature of the incident in response to public disapproval of the police department's handling of Plaintiff;

    c.   Despite Defendant Mentesana and others being on the scene, searching the residence, and/or holding Plaintiff at gun point outside naked, Defendant Mentesana did not document his actions or interaction with Plaintiff, and the only officer on scene to create an incident report was Defendant Arrowood;

    d.   Other actions, inactions, and particulars as may be show at the trial of this matter;

110.     Agents of Defendant City are legally capable, as individuals, of conspiracy among themselves. *See Pridgen v. Ward et al*, Opinion No. 4770, S.C. Ct. App. (2010) (citing *Lee v. Chesterfield Gen. Hospital, Inc.*, 289 S.C. 6, 344 S.E.2d 379 (S.C. Ct. App. 1986) (agents of corporation may conspire among themselves)).

111.     Plaintiff, as a direct and proximate cause of Defendants' acts and omissions set forth collectively herein, is entitled to recover for actual, consequential and punitive damages in an amount to be determined by a jury.

112.     Said damages may be recovered from Defendants named herein in their individual capacity, jointly and severally.

113.     Plaintiff is entitled to compensatory damages, attorney's fees pursuant to 42 U.S.C. § 1988, and costs to be determined by the trier of fact and punitive damages in an amount sufficient to punish Defendants as well as deter similar conduct by Defendants and others.

WHEREFORE, the Plaintiff prays for actual, consequential, compensatory, and punitive

damages, costs, attorney's fees, and all other remedies the Court and trier of fact deems just and proper in law and in equity.

Respectfully Submitted,

**BAMBERG LEGAL, LLC**

BY:     */s/ Justin Bamberg*_____
Justin T. Bamberg, Esq. (11363)
104 Bridge Street
Bamberg, SC 29003
P: 803-956-5088
F: 803-956-5094
E: jbamberg@bamberglegal.com

*Attorney for Plaintiff*

Bamberg, South Carolina
June 2, 2022

23